IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2014

**STATE OF TENNESSEE v. DAVID WAYNE FELTS**

**Criminal Court for Davidson County**
**No. 2011-B-1774    Judge Steve R. Dozier**

---

**No. M2013-00939-CCA-R3-CD - Filed July 8, 2014**

---

A Davidson County jury convicted the Defendant, David Wayne Felts, of six counts of rape of a child and two counts of aggravated sexual battery.  The trial court sentenced the Defendant as a Range II, multiple offender to a total effective sentence of one hundred and fourteen years to be served in the Tennessee Department of Correction.  On appeal, the Defendant contends: (1) the evidence is insufficient to support his rape of a child conviction in Count 2; (2) the trial court failed to compel the State to elect specific facts sufficient to distinguish Count 6 from Count 5; (3) the trial court erred when it admitted into evidence the victim's statement to a nurse practitioner as a statement made for the purpose of medical diagnosis and treatment, pursuant to Tennessee Rule of Evidence 803(4); (4) the trial court erred when it admitted into evidence the victim's statement as a prior consistent statement; and (5) the trial court imposed an excessive sentence.  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Emma Rae Tennent, Nashville, Tennessee (on appeal); Katie Ladefoged and Kristin Stangle, Nashville, Tennessee (at trial) for the Appellant, David Wayne Felts.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; Kristin Menke, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

## I. Facts

This case arises from the Defendant's alleged sexual encounters with his girlfriend's child, the victim, who was five years old at the time of the encounters, and eight years old at the time of trial. A Davidson County grand jury indicted the Defendant for six counts of rape of a child and two counts of aggravated sexual battery.

## A. Trial

The parties presented the following evidence at trial: The victim, F.O.,[1] testified that she was eight years old at the time of trial and that her birthday was on March 19, 2004. She testified that she lived with her dad, C.O., as well as her "nana," her "poppa," and "David [Robertson], the one that lives downstairs." The victim explained that Mr. Robertson was a "part of [her] family" but that she was not related to him. The victim stated that she had last seen her mother when she was seven years old and that she could not remember the last time she had spoken to her mother. The victim identified the Defendant in the courtroom and stated that her mother and the Defendant were "together" when the victim was living with her mother. The victim stated that the Defendant did not live with her and her mother but that the victim stayed with him occasionally in a hotel. The victim stated that the Defendant "touched [her]" when they were staying together at the hotel, and she said that "his front touched [her] back." The victim demonstrated with two dolls that her body was on top of the Defendant's body with her back towards him. She explained that the Defendant's "front touch[ed] [her] back on the inside. . . ." She stated that her mother was at work when this happened.

The victim testified that, while they were at the hotel, the Defendant used a yellow "cream" from a round container while touching her and put it on the victim's "back" on the "inside." She stated that the Defendant used his finger to "put the cream on the inside" but did not put his finger inside of her. The victim stated that, on a different day in the same hotel, she and the Defendant were on the bed, and his "front touched [her] back." She recalled that the Defendant was lying down, and she was sitting up with her back facing the Defendant. She stated that his front touched her back on the inside. On another occasion in the same hotel, the victim stated that the Defendant touched her while she was on the bed and that the front of his body touched the back of her.

---

[1] It is the policy of this Court to refer to juvenile victims of sexual assault and their relatives by their initials only in order to protect the victims' identity.

The victim testified that, on another occasion in the hotel, the Defendant used his fingers to touch her "front" on the bed. The victim was shown two drawings of the human body and told that one drawing was her body and the other drawing was the Defendant's body. When asked to circle with a pen on the drawing of her body her "front and [] back private," the victim indicated her genitalia and rectal area. On the drawing of the Defendant's body, the victim also identified the Defendant's front and back "private," and she stated that her testimony about the Defendant touching her "front" and her "back" involved the genitalia and rectal area she had circled on the drawings. The drawings were admitted into the record as evidence. The victim indicated the Defendant's "front" genitalia when asked what part of him went inside her "back" genitalia. The victim also indicated on the drawing of the Defendant's body that his fingers had touched her "front" and "back" genitalia and rectal area, and she stated that he used his fingers to put the cream on her.

The victim recalled that at one point, she lived with her mother and the Defendant in a trailer, and she remembered having to pack her clothes and leave the trailer because "the police were coming." She stated that she, her mother, and the Defendant went to Miami, and then to Puerto Rico, because they were "running from the police." The victim said that "something" happened in the trailer between her and the Defendant. She explained that they were in the living room on the couch, and his "front" touched her "back" on the "inside." The victim stated that the Defendant touched her in the bedroom of the trailer on the floor, and his "front touched the inside of [her] back[.]" The victim used dolls to indicate that she and the Defendant were lying on the floor, with her on top of him, when that incident occurred. The victim indicated that she was referencing her buttocks.

The victim testified that she told her father's girlfriend, Lisa McLeod, that the Defendant had touched her. She stated that she told Ms. McLeod because it was "bothering" her. The victim stated that after she told Ms. McLeod, she talked with someone named "LaToya" about what had happened to her. She also stated that she had watched two video recordings of her talking to "LaToya" about what had happened with the Defendant. The victim agreed that in both videos she talked about the Defendant touching her and that she used dolls in one of the videos to indicate where the Defendant had touched her. The victim agreed that she told "LaToya" that the Defendant touched her "front private" "on the inside" with his fingers, but she could not remember when that happened. She agreed that she told "LaToya" that the Defendant touched her "front private" "on the outside" with his fingers.

The victim testified that she played a game called "Princess" with the Defendant. She stated that the Defendant touched her "back" on the "inside" with his "front" when they played "Princess" in the bedroom of the trailer.

On cross-examination, the victim testified that she was in the hotel room the first time

3

"it" happened. She stated that she was awake on the bed with her clothes off, and the Defendant put "his front private in [her] back[.]" She stated that the next time "it" happened was in the trailer on the couch, while her mother was at work, and the Defendant "did the same thing." She explained that he "always" did the same thing. She agreed that she remembered the Defendant touching her one time in the hotel room and one time in the trailer.

On redirect-examination, the victim agreed that she could not remember all of the times the Defendant touched her.

Debbie Morgan testified that F.O. was her husband's great-niece and that she had known F.O. all of her life. She stated that F.O. used to stay with her and her husband frequently on the weekends. Ms. Morgan stated that her husband's family had a family event on or about December 26, 2009, attended by F.O. and C.O. Ms. Morgan testified that during the event, F.O. climbed into her lap and told Ms. Morgan that she had a secret. Ms. Morgan recalled that F.O. said that her mother had told F.O. not to tell the secret and that the secret was about "things that were happening while [F.O.'s mother] was in bed and things that [the Defendant] did." Ms. Morgan testified that F.O. told her that the Defendant "would take her in her bedroom and [close] the door and they would play Prince and Princess. And then [F.O] said that [the Defendant] touched her [private parts]." Ms. Morgan testified that she was upset about the victim's "secret," but she remained calm until C.O. arrived to take F.O. home. Ms. Morgan then told C.O. what F.O. had said about the Defendant, and then C.O. took F.O. into a bedroom to talk to her. Ms. Morgan testified that she called the Dickson County police that afternoon and was told that their department did not have authority over events that happened in Davidson County. Ms. Morgan then called Metropolitan Nashville Police Department, and she later went to a Nashville police station to file a report. She recalled that she relayed F.O.'s statements to Officer Chris Clark. Ms. Morgan stated that she did not know who the Defendant was at that point.

Ms. Morgan testified that she told her husband and C.O. that she had called the police. Ms. Morgan said she later tried to file a missing person's report, because she believed that the victim's mother had taken F.O. out of Nashville. Ms. Morgan recalled that she spoke with Detective Rob Carrigan, specifically about F.O. being "gone" and Ms. Morgan's concern for F.O.'s safety. Ms. Morgan stated that she next saw F.O. in February of 2010 at the airport when F.O. came home from Puerto Rico. Ms. Morgan stated that F.O. stayed at Ms. Morgan's house for a week after she came home and that, one night when they were getting ready for bed, F.O. told Ms. Morgan that, "[she] couldn't wear [her] pajamas in bed" because when "[the victim's mother] and [the Defendant] had [her] sleep in bed with them they wouldn't let [her] wear [her] panties or pajamas." F.O. said "[the Defendant] touched [her,]" but she did not describe how he touched her. Ms. Morgan testified that F.O. had only

4

told her that the Defendant touched her private parts.

C.O. testified that F.O. had lived with him full-time since February 1, 2010, and that he and the victim's mother did not have a custody arrangement regarding F.O prior to that date. He testified that in 2009, F.O. and her mother moved from Cookeville, Tennessee to Nashville, Tennessee. C.O. stated that he and the victim's mother generally shared custody of F.O. and that F.O. would typically be with the parent who was not at work. He agreed that the victim's mother worked nights and that he worked during the day. C.O. stated that the victim's mother was living in motels and a trailer park in Nashville during 2009. He stated that he and the victim's mother were still married at that time and that they had not sought a divorce for financial reasons.

C.O. recalled that the victim's mother called him at some point in early 2009 and said she had a boyfriend in Nashville. C.O. identified the Defendant in the courtroom as the victim's mother's boyfriend. C.O. agreed that he learned from Ms. Morgan in late 2009 that "something" had gone on between his daughter and the Defendant. He stated that Ms. Morgan told him that F.O. had told her that the Defendant touched F.O.'s private parts. C.O. said he "tried" to question F.O. about what had happened, but F.O. would not talk to him. He stated that he did not call the police because he did not think it was necessary and because F.O. was "safe" at the time.

Approximately two days after his conversation with Ms. Morgan on December 26, 2009, C.O. told the victim's mother about F.O.'s statement regarding the Defendant. The conversation occurred in C.O.'s living room, and the Defendant was present. C.O. recalled that the victim's mother and the Defendant "blew it off like nothing really happened." The victim's mother and the Defendant indicated that they were thinking about leaving Nashville, to which C.O. responded they could not take F.O. with them and that he would call the police if they did. C.O. agreed that he let the victim's mother and the Defendant take F.O. with them when they left his house that day. He stated that he knew the police had already been contacted by Ms. Morgan.

C.O. testified that he contacted police after receiving a telephone call from the victim's mother in Florida approximately one week later, in January 2010. He agreed that the police found F.O. in Puerto Rico in late January 2010, and that he went there to pick her up. He stated that he and F.O. arrived back in Nashville on February 1, 2010, and that he took F.O. to the doctor within the first week. He agreed that F.O. stayed with Ms. Morgan for her first week back to help F.O. adjust to her return to Tennessee. C.O. testified that he took F.O. to be interviewed on February 3, 2010. C.O. testified that he noticed changes in F.O.'s behavior after she returned from Puerto Rico, including "having outbursts," "acting out," and being mad. He described F.O. as being very calm at times and very angry at other

5

times. C.O. said he did not ask F.O. about what had happened with the Defendant.

C.O. agreed that in January of 2011, the issue of the Defendant touching F.O. arose again because F.O. "started talking" to Lisa McLeod, C.O.'s girlfriend. Ms. McLeod told C.O. what F.O. had told her, and C.O. immediately contacted Detective Carrigan. C.O. then took F.O. for another forensic interview in February 2011.

Teresa Lovell testified that she was the property manager at Rainbow Village trailer park in 2009, and that the Defendant had rented a mobile home in the park on December 1, 2009. She stated that the rental agreement signed by the Defendant in late 2009 listed the victim's mother and F.O. on the lease. Ms. Lovell stated that on December 28, 2009, she went to the Defendant's mobile home to check on a barking dog report and found that he, the victim's mother, and F.O had left their trailer. She stated that she did not see them again after that day. She recalled that the police came to the trailer park to look for the Defendant.

LaToya Mitchell testified that she worked at Nashville Children's Alliance, a child advocacy center, in Nashville, Tennessee. She explained that the center provides counseling services to children, as well as forensic interviews, which she described as "fact-finding" interviews. Ms. Mitchell said that her job was to conduct the forensic interviews and that the interviews were recorded and sent to law enforcement, along with a typed summary report of the interview.

Ms. Mitchell testified that she interviewed F.O. on February 3, 2010. Ms. Mitchell stated that, during the February 3 interview, F.O. did not make any disclosures to her about sexual abuse. Ms. Mitchell stated that F.O. told her that the Defendant had been arrested "because he did some bad things" and that F.O. made statements to her about running from the police. F.O. told Ms. Mitchell about "playing games" with the Defendant, and she described the game as "play[ing] castles." F.O. told Ms. Mitchell that she ran from the police with the Defendant to Miami and Puerto Rico. Ms. Mitchell stated that, during the interview, F.O. identified on a drawing several parts of the human body, specifically breasts, genitals, and buttocks.

Ms. Mitchell testified that she interviewed F.O. a second time in January of 2011. During that interview, which was recorded, F.O. again identified parts of the human body on a drawing and on a doll. On the female body, F.O. identified the female genitalia and buttocks. On the male body, she identified the male genitalia, referring to it as a "pee-pee," and the fingers. Ms. Mitchell stated that F.O. also referred to her genital and rectal areas as the "front body part" and the "back body part." The video recording of the interview was played for the jury. In the recording, F.O described her living situation and her family members. She said that she was there at the interview "cause stuff happened to [her],"

6

specifically that the Defendant "touched [her] like right here and right here[,]" indicating her genital area and buttocks and stating those areas are "where we use the restroom at." F.O. told Ms. Mitchell that the touching happened in a hotel room "a whole lot of times." She also said that "he did it with his finger and his pee-pee," indicating that he touched her genital area with his finger and penis. F.O. said that her clothes were off when this touching happened. F.O said that she told Ms. McLeod about what happened to her.

In the video recording, F.O. reiterated several times that the Defendant touched her where she uses the restroom with his finger and with his "pee-pee" in the hotel room, and said that her mother was at work when the touching occurred. F.O. said that the Defendant touched inside of her "[w]ith his finger and his thingy." Together Ms. Mitchell and F.O. decided to "call" the genital area and buttocks the "front" and the "back." When asked if the Defendant touched her front or back, F.O. responded that he touched "both of [them]." She stated that his finger went "inside" the front part and the back part. She described the back part as the area "[she] uses to poop." Using anatomical dolls, F.O. demonstrated her and the Defendant lying down on the bed and showed Ms. Mitchell that he touched her buttocks with "his pee-pee" and says it went "inside." Ms. Mitchell asked F.O., "how did [his pee-pee] get inside?" and F.O. responded, "you know that stuff that's slick that helps – that slips in?" F.O. said that the Defendant put cream on her "right inside." F.O. said "it" happened more than one time in the hotel room.

On cross-examination, Ms. Mitchell testified that during both interviews, she asked F.O. non-leading questions. She reiterated that F.O. did not disclose any "touching" during the first interview and that she specifically denied that the Defendant had touched her or that she had seen his genitals.

Sue Ross testified that she worked at Our Kids Center in Nashville, Tennessee, which she described as a facility established to perform medical evaluations on children who had allegedly been sexually abused. Ms. Ross stated that she was a pediatric nurse practitioner and conducted medical exams on the children who came to the center. Ms. Ross was qualified as an expert in the areas of pediatric nursing and forensic examinations.

Ms. Ross testified that she conducted an interview and medical examination of F.O. on January 25, 2011. F.O. was six years old at the time of their meeting. Ms. Ross read for the jury portions of her notes from her interview with F.O.:

> When asked where her private parts are, [F.O.] stated: My private parts, and pointed to her genital area and bottom. When asked if anyone had touched her private parts [F.O.] stated yes, [the Defendant.] [The Defendant] touched me with his finger and his pee-pee. When asked where he touched her with his

7

finger [F.O.] stated: He touched me here, and pointed toward her genital area, and here, and pointed toward her buttocks. When asked if [the Defendant] touched her with his finger on the part she pees out of or something else [F.O.] stated: Yes, the part I pee out of. When asked if [the Defendant] touched the parts she pees [sic] out of on top of her clothes [sic] or on her skin [F.O.] stated: On my skin. When asked if he touched the inside or the outside of the part she pees out of [F.O.] stated: He touched both. When asked if he touched her with his finger on the part she poops out of or something else she stated: Yeah, the part I poop out of. When asked if his hand touched the part she poops out of on top of her clothes or on her skin she stated: On my skin and he touched the outside and the inside to [sic]. When asked if [the Defendant] touched her anywhere else on her body she stated: No. When asked what [the Defendant's] pee-pee touched [F.O.] stated: He touched me back here, pointed toward her buttocks. When asked if that was the part she poops out of or something else [F.O.] stated: The part I poop out of. When asked if [the Defendant's] pee-pee touched her on her clothes or on her skin [F.O.] said: He touched my skin, you know, and on the inside of me back here and also on the outside. When asked if she experienced any pain or bleeding [F.O.] said: Yes, it hurt. When asked if she saw anything on or come out of his pee-pee, [F.O.] stated: Stuff came out of his pee-pee, it was wet and it went on my back. When asked if this happened one time or more than one time [F.O.] stated: More than one time. When asked if her private parts were touched in any other way [F.O.] stated: No. When asked if she were made to touch his privates in any way she said: No. When asked if she had any other additional information she would like to share she said: No. When asked if she had any concerns or questions regarding her health she said: No.

Ms. Ross testified that she performed a physical examination of F.O.'s genital areas, and the results were normal. Ms. Ross testified that less than ten percent of the children she examines for signs of sexual penetration exhibit acute injuries to their genitalia.

On cross-examination, Ms. Ross agreed that her examination of F.O. took place almost a year after the alleged sexual abuse occurred.

Detective Rob Carrigan testified that he was employed with the Metropolitan Nashville Police Department and was assigned to the sex crimes unit. Detective Carrigan testified that on December 30, 2009, he received a complaint involving the Defendant regarding a concern that the Defendant may have "fled the jurisdiction" with his girlfriend and a young girl. He stated that there were suspicions that there might be sexual abuse of the young girl, so the complaint was referred to his department. Detective Carrigan testified that

he and Detective Joe Weaver went to the Defendant's trailer home. The manager of the trailer park verified that the trailer lease listed the names of the Defendant, the victim's mother, and F.O. as living there. Detective Carrigan learned that the Defendant, the victim's mother, and F.O. might be in the Miami area, so he contacted the youth services department to release an alert for a missing child. He stated that eventually he got information that they had gone to Puerto Rico and that he was able to track them there.

Detective Carrigan testified that he spoke with C.O. and Ms. Morgan throughout the period of January 2010 while they attempted to locate F.O. in Puerto Rico. He stated that F.O. was brought back to the country and interviewed forensically in Nashville. Detective Carrigan stated that F.O. was interviewed in February 2010 and that she did not make any allegations of sexual abuse at that time. He testified that in January 2011, he received a call from C.O. who told him that F.O. was making "some disclosures of sexual abuse." At that point, Detective Carrigan reopened the case and arranged for another forensic interview with F.O. at Our Kids Clinic.

Based on this evidence, the jury convicted the Defendant of six counts of rape of a child and two counts of aggravated sexual battery. The trial court sentenced the Defendant as a Range II, multiple offender to thirty-eight years of confinement for each rape of a child conviction and eighteen years for each aggravated sexual battery conviction and ordered that three of the rape of a child sentences run consecutively and the remaining sentences run concurrently, for a total effective sentence of one hundred and fourteen years to be served in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant presents the following issues: (1) the evidence is insufficient to support his rape of a child conviction in Count 2; (2) the trial court failed to compel the State to elect specific facts sufficient to distinguish Count 6 from Count 5; (3) the trial court erred when it admitted into evidence the victim's statement to a nurse practitioner as a statement made for the purpose of medical diagnosis and treatment, pursuant to Tennessee Rule of Evidence 803(4); (4) the trial court erred when it admitted into evidence the victim's statement as a prior consistent statement; and (5) the trial court imposed an excessive sentence.

### A. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence to convict him of rape of a child as charged in Count 2 of the indictment. Specifically, the Defendant asserts that the

victim's testimony did not establish that the Defendant penetrated her rectum with his finger, as charged in the State's election of offenses for Count 2. The State responds that the victim's testimony was sufficient to establish that the Defendant penetrated her rectum, however slight, and therefore the evidence was sufficient to establish the elements of the offense. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

"The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given

10

> to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant challenges the evidence supporting his rape of a child conviction in Count 2 of the indictment. A conviction for rape of a child requires "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2010). Tennessee Code Annotated section 39-13-501(6) and (7) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . ." and sexual contact as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . ."

The State elected the following facts specific to Count 2:

> The [D]efendant penetrated the victim's rectum with the [D]efendant's fingers. The victim testified that the [D]efendant used his fingers to put the cream on the inside of the victim's back, identified as the victim's rectum. The victim [used] dolls to demonstrate the victim and the [D]efendant's bodies positioned side-by-side when this incident occurred.

The evidence, considered in the light most favorable to the State, showed that the victim and the Defendant were alone in a bed together inside a hotel room. The victim testified that, while in the bed, the Defendant used yellow cream from a round container and put it on the victim's "back part." She testified that the Defendant put the cream on the "inside" of her "back" with his finger. Using drawings of the human body and anatomical dolls, the victim identified her "back" as her rectum. A nurse practitioner testified that, during her interview with the victim, the victim told her that the Defendant put his finger in her rectum. Accordingly, the evidence was sufficient to support the jury's finding beyond

a reasonable doubt that the Defendant committed rape of a child as alleged in Count 2 of the indictment.

## B. Election of Offenses

The Defendant contends that the trial court erred when it allowed his rape of a child conviction in Count 6 "to stand" because the State's election of offenses and the proof at trial failed to distinguish Counts 5 and 6. He thus contends that his conviction in Count 6 violates his protections against double jeopardy as guaranteed by the Sixth Amendment. The State responds that the Defendant failed to raise this issue in his motion for new trial, and thus he has waived appellate review pursuant to Tennessee Rule of Appellate Procedure 3(e). The State further contends that the Defendant has failed to establish that he is entitled to plain error review. We agree with the State.

We note that the only issues raised in the Defendant's motion for new trial were: (1) the trial court erred in allowing the State to introduce evidence that the Defendant left the country with the victim; (2) the trial court erred in allowing the State to introduce the victim's statement and have the statement read into the record; (3) the trial court erred in its instructions to the jury; (5) the jury's verdict was against the weight of the evidence; and (6) the trial court imposed an excessive sentence.

Tennessee Rule of Appellate Procedure 3(e) requires that all issues raised on appeal must be "specifically stated" in a motion for a new trial, or the issue "will be treated as waived." The grounds relied upon must be specified with reasonable certainty in a motion for a new trial to advise the trial court and opposing counsel of the alleged error relied upon and also to enable this Court to see that the alleged error was presented to the trial court for correction. *State v. King*, 622 S.W.2d 77, 79 (Tenn. Crim. App. 1981).

This Court may, however, review an issue which would ordinarily be considered waived if the Court finds plain error in the record. *See* Tenn. R. App. P. 36(b). The doctrine of plain error provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b).

This Court will grant plain error review only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it 'probably changed the outcome of the trial.'" *State v. Hatcher*, 310

S.W.3d 788, 808 (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994))). "If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* (citation omitted). We need not consider all five factors when the record clearly establishes that at least one of the factors is not met. *Hatcher*, 310 S.W.3d at 808. It is the Defendant's burden to persuade this Court that plain error exists and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." *State v. Hester*, 324 S.W.3d 788, 808 (Tenn. 2010).

The Defendant contends that "for the purposes of double jeopardy, the conduct upon which his conviction for rape of a child in [Count 6] is based, [] penetration [of the victim's rectum] in F.O.'s room in the trailer, constitutes the same offense as in [Count 5], which also alleges [] penetration [of the victim's rectum] in F.O.'s room in the trailer.

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citing *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996); *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Johnson*, 53 S.W.3d at 631 (citing *Brown*, 992 S.W.2d at 391). A jury's verdict is not unanimous when the jurors find the same elements of a particular crime based on different facts and offenses; the jurors must "deliberate and render a verdict based on the same evidence." *Id.* "[T]here should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Tennessee Supreme Court explained that "[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." *Kendrick*, 38 S.W.3d at 568 (quoting *Shelton*, 851 S.W.2d at 137).

In making an election, the identification of, and distinction among, alleged incidents in multiple sex offense cases is required primarily to ensure unanimity of a verdict. *State v. Jones*, 953 S.W.2d 695, 697 (Tenn. Crim. App. 1996); *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App., at Nashville, Jan. 27, 1999), *no Tenn. R. App. P. 11 application filed*. Thus, with regard to the election of offenses, the standard for sufficiency of the evidence applies to the designation of offenses as though

13

it were an element of the offenses. *Hines*, 1999 WL 33107, at *4. Not only must the State's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the State must obviously support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt. *Id.*

The State made the following election of offenses for Counts 5 and 6:

> Count 5 of the indictment alleges . . . the following conduct: The [D]efendant penetrated the victim's rectum with his penis. The victim testified that the [D]efendant put his [front], identified as his penis, in the victim's back, identified as her rectum. [The victim] said that this incident happened in the trailer on the floor of her bedroom. The victim use[d] the dolls to demonstrate that the [D]efendant was lying on the floor and she was lying on top of him with her back facing the [D]efendant.

> Count 6 of the indictment alleges . . . the following conduct: The [D]efendant penetrated the victim's rectum with his penis. The victim testified that the [D]efendant put his front, identified as his penis in the victim's back, identified as a rectum. [The victim] said this incident happened in the trailer in the victim's room while they were playing the princess game.

During the trial, the victim testified that the Defendant touched her in the bedroom of the trailer on the floor and that his "front touched the inside of [her] back[.]" The victim used dolls to indicate that she and the Defendant were lying on the floor, with her on top of him, when that incident occurred. The victim indicated that she was referencing her buttocks when using the word "back." The victim also testified that, on another occasion, the Defendant touched her "back" on the "inside" with his "front" when they played "Princess" in the bedroom of the trailer. The victim testified about two distinct and separate occasions when the Defendant penetrated the victim's rectum on the bedroom floor of the trailer, and the State elected these specific facts to support the charges in Counts 5 and 6. This is sufficient to identify and distinguish among the alleged incidents to ensure unanimity of the jury's verdict. The record does not evince plain error. The Defendant is not entitled to relief on this issue.

## C. Hearsay

The Defendant contends that the trial court erred when it allowed Ms. Ross to testify about the victim's statements to her at Our Kids Clinic. The Defendant contends that the victim's statement, admitted into evidence under the medical diagnosis and treatment

exception to the hearsay rule, pursuant to Tennessee Rule of Evidence 803(4), was made in an interview conducted for the purposes of gathering evidence for a criminal prosecution, not for the purpose of diagnosing and treating a medical condition. The State responds that the victim's statement to Ms. Ross was properly admitted. We agree with the State.

Hearsay evidence consists of out-of-court statements offered for the truth of the matter they assert. Tenn. R. Evid. 801(c). There are concerns with reliability and the inability to cross-examine such statements, which is why they are excluded as admissible evidence. Tenn. R. Evid. 802. When the reliability of a statement can be verified, generally by the context of the statement, that statement may fall under a hearsay exception and then be admissible in court. One of the acceptable exceptions to the rule against hearsay evidence is Tennessee Rule 803(4), which permits hearsay admitted as evidence in trial if the statement is made for the purpose of a medical diagnosis:

> Statements made for [the] purposes of medical diagnosis and treatment describing medical history; pain or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The rationale behind this exception depends on the notion that people will be forthcoming to medical professionals to ensure proper and appropriate treatment and care. Neil P. Cohen, et al., *Tennessee Law of Evidence*, §8.09[3][b] (5th ed. 2005). In *State v. McLeod*, the Tennessee Supreme Court held that statements by a child pertaining to sexual abuse, about the general character, cause, or source, are admissible as testimony from the person to whom the child told it, so long as there is a jury-out hearing and an assurance that the child gave the statement for diagnosis and treatment. 937 S.W.2d 867, 870 (Tenn. 1996). When the trial court holds its jury-out hearing to address the indicia of reliability of the child victim's statement, it should analyze "the timing of the statement, the contents of the statement, whether the statement was made in response to suggestive or leading questions, whether the statement was improperly influenced by another, and any other circumstance that may undermine the statement's trustworthiness such as a custody battle or family feud." *State v. Tucker*, No. M2005-00839-CCA-R3-CD, 2006 WL 547991, at *9 (Tenn. Crim. App., at Nashville, Mar. 7, 2006) (citing *McLeod*, 937 S.W.2d at 870, *State v. Stinnett*, 958 S.W.2d 329, 332 (Tenn. 1997)), *no Tenn. R. App. P. 11 application filed*.

We conclude that the trial court did not abuse its discretion when it admitted the statement under the medical diagnosis and treatment exception. Ms. Ross, a nurse practitioner, testified that the purpose of her interview with the victim, to obtain the victim's medical history, was for "medical diagnosis and treatment" and was then followed by a physical examination of the victim. The statement read into the record by Ms. Ross included

15

the questions she posed to the victim about the Defendant touching her. Detective Carrigan testified that Ms. Ross's interview with the victim took place after the victim made disclosures of sexual abuse. Ms. Ross and Detective Carrigan's testimony provided the trial court with a sufficient overview about when and how the victim's statement was made, from which the trial court could make a determination that the statement was made for the purposes of medical diagnosis and treatment, and a determination about the statement's reliability. Accordingly, the trial court did not abuse its discretion when it admitted the victim's statement under the hearsay exception pursuant to Rule 803(4). The Defendant is not entitled to relief on this issue.

### D. Victim's Statement

The Defendant next contends that the trial court erred when it allowed the video recording of the victim's interview with Ms. Mitchell to be played for the jury on the basis that the victim's statement in the interview was a prior consistent statement. He contends that the victim was not cross-examined about "whether her allegations on direct examination were truthful" and that it is impermissible to admit this statement into evidence to corroborate the victim's testimony "absent an impeaching attack" on the victim's testimony. The State responds that, during cross-examination of the victim, the Defendant's counsel attempted to "undermine" her testimony by suggesting it was influenced by several adults and by questioning the victim's memory regarding the incidents with the Defendant. For this reason, the State contends, the victim was in need of a rehabilitation, and thus, the prior consistent statement was properly admitted into evidence. We agree with the State.

Generally, prior consistent statements are not admissible to bolster a witness's credibility. *State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, three exceptions to this general rule exist. First, a "prior consistent statement may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). Second, a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness's testimony was either fabricated or based upon faulty recollection. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Moreover, "the impeaching attack which allows for corroboration may occur during cross-examination of the witness . . . . Under such circumstances, the [witness's] statement made before the inconsistent statement but which was consistent with his trial testimony" is admissible to rehabilitate the witness. *Id.* (citations omitted). Third, a prior consistent statement may be admissible when a witness's prior statement is used out of context to cross-examine the witness. *State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn. 1990).

In this case, defense counsel questioned the victim about her ability to remember the incidents with the Defendant, the number of times she had met with the State to discuss her trial testimony, and with how many adults in her family the victim has discussed the abuse. Defense counsel asked the victim if she had "practice[d]" her testimony with the Assistant District Attorney and if their conversations were always about the victim's testimony. In our view, this line of questioning insinuated to the jury that the victim had been coached by either the State or her family and implied that the victim was not being truthful during her testimony. In such a case, the victim's prior consistent statement to Ms. Mitchell was admissible to rebut these insinuations. *See Benton*, 759 S.W.2d at 433. Accordingly, we conclude that the statement was admissible. The Defendant is not entitled to relief.

### E. Sentencing

The Defendant lastly contends that the trial court imposed an excessive sentence through its use of partial consecutive sentencing. The Defendant contends that the sentence imposed is greater than that deserved for the offenses committed and is not the least severe measure necessary to achieve the purposes for which the sentence is imposed. The State responds that the trial court properly considered the evidence in light of the principles of sentencing and imposed a sentence within the permissible range and "specifically fitted to the crimes and the criminal history of the [D]efendant." We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

Thus, the reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of

reasonableness. *Id.* at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2012); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Tennessee Code Annotated section 40-35-115(b) (2012) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As is relevant in this case, the trial court found the following criteria applicable:

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

T.C.A. § 40-35-115(2) and (5). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). In addition to these

18

criteria, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *see also* T.C.A. §§ 40-35-102(1), -103(2); *In re Sneed*, 302 S.W.3d 825, 828-29 (Tenn. 2010). We review a trial court's decision to impose consecutive sentences for an abuse of discretion. *State v. James Allen Pollard*, ___ S.W.3d ___, No. M2011-00332-SC-R11-CD (Tenn. Dec. 20, 2013).

The trial court made the following statement at the sentencing hearing:

> But also in terms of enhancing factors and potential mitigating, I'm required to discuss and I do find several enhancing factors present. That [the Defendant] has prior convictions in addition to those that are necessary to qualify him as a range 2 offender. And they're set out in the enhancing notice. They're set out in the presentence report.

> [He has prior] E felony, D felony, A felony, B felony [convictions], and [] the felony from federal court. So those additional [prior] convictions would require the Court to apply that particular enhancing factor. And the Court places great[] [weight] upon it.

> I do also find that . . . under the language of this particular enhancement statute law that he . . . did under the circumstances of this particular case abuse a position of trust and that he wasn't a stepfather, but he was acting as such. He wasn't married to [the victim's mother], though he was acting . . . as the caretaker in the household of [the victim]. So that particular enhancing factor applies and the Court places great weight upon it.

> . . .

> In terms of mitigating factors, I do not find any present and would not apply any.

> In terms of the other statute the Court has to analyze and look at, that's [Tenn. Code Ann. §] 40-35-115 in terms of how these particular convictions, six counts of rape of a child and two counts of aggravated sexual battery, would run with each other, I do find that based on the record of [the Defendant] that he has a criminal record that is extensive. That is, he has multiple convictions; gets convicted of multiple sexual abuse convictions; gets released and is right back doing the same thing. So that factor applies under

19

that particular sentencing factor.

As well as the factor that deals with multiple convictions for statutory offenses involving the sexual abuse of a minor. The Court is required to consider a number of things, which I have, I am: The relationship between the [D]efendant and the victim, already discussed that to some extent, that particular analysis in this particular case wouldn't favor [the Defendant]; the time span of the [D]efendant's undetected sexual activity . . . [.]

But the other analysis that's involved is the nature and extent and scope of the sexual acts and the extent of residual physical and mental damage. We've heard about residual mental health damage. That weighs against [the Defendant] and in favor of running some of these convictions consecutively.

In terms of the nature and scope of the sexual acts, we have digital and penile/anal intercourse on multiple occasions, different locations, hotel rooms, trailer, floor, playing games during the abuse, princess game, and all that testimony we heard about, using some sort of lubricant that we've heard testimony about; testimony that occurred more times than I can remember, talking about [the victim's] testimony.

So obviously we heard from Ms. Ross that there was vaginal/digital penetration. So obviously there are multiple acts occurring multiple places on a five-year-old over a seven month period of time that led then to mental health damage, therapy that has been required. So these two subsections of that particular statute, [section] 40-35-115 apply.

So what happens? I mean, hopefully the particular sentence imposed by me at this particular time will give [the victim] faith in the legal system; that she knows because of her reporting this and her courage to come up here and face [the Defendant], no other young child will be abused. I mean the simplest way to put it to [the Defendant] is, enough is enough. I mean, this particular sentence that the Court is going to impose, for goodness sakes, will hopefully not allow [the Defendant] to have an opportunity in any way to abuse any other children.

The trial court imposed thirty-eight year sentences for each of the six rape of a child convictions, and eighteen year sentences for each of the two aggravated sexual battery convictions, and ordered that three of the rape of a child convictions would be consecutively to the remaining five convictions, for a total effective sentence of 114 years.

20

The trial court placed great weight upon the enhancement factors that the Defendant had a history of criminal convictions and that he abused a position of trust by sexually abusing the victim while she was in his care. The evidence supports the application of these factors. The court further stated, in support of its order of partial consecutive sentencing, that two consecutive sentencing factors applied: the fact that the Defendant was convicted of multiple offense involving the sexual abuse of a minor, and the damaging nature and extent of the abuse and the effect on this particular victim. *See* T.C.A. § 40-35-115(2) and (5). The evidence supports the application of these consecutive sentencing factors. The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. Based on the evidence at trial, the sentence imposed on the Defendant was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that the Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

21